**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————
                                                    )
THE LINCOLN NATIONAL LIFE          )          Civil Action No.: 09-03361(FLW)
INSURANCE COMPANY,                     )
                                                    )
              Plaintiff,                         )              **OPINION**
v.                                                  )
                                                    )
YOEL SCHWARZ AND ERNST           )
SCHWARZ AS TRUSTEES OF THE      )
VALERIA SCHWARZ IRREVOCABLE  )
LIFE INSURANCE TRUST,                  )
                                                    )
              Defendants.                      )
———————————————————

**WOLFSON, United States District Judge:**

Plaintiff Lincoln National Life Insurance Company ("Plaintiff" or "Lincoln") seeks rescission of two life insurance policies (the "Policies"), respectively valued at $2.5 million and $2 million, owned by Yoel Schwarz and Ernst Schwarz ("Defendants") as trustees of the Valeria Schwarz Irrevocable Life Insurance Trust (the "Trust") established in the name of the now-deceased Valeria Schwarz ("Ms. Schwarz").  Lincoln alleges that at the time Ms. Schwarz applied for the Policies, she intended to sell her policy to "stranger investors" in the secondary life insurance market, and thus no death benefits are payable because the Policies lacked  a person with an insurable interest at their inception. Further, Lincoln alleges that Defendants committed common law fraud and violated the New Jersey Insurance Fraud Act ("IFPA"), N.J.S.A. 17:33A-1, *et. seq.*, as a result of the material misrepresentations made on two applications (the "Applications") that led Lincoln to issue the Policies.  In lieu of filing an Answer, Defendants move to dismiss the instant Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6), contending that each of the Policies contained an incontestability clause that acts as an absolute bar to any attempt to rescind the Policies.  Further, Defendants argue that the Trust did hold an insurable interest.  Defendants also contend that Lincoln failed to plead both common law fraud and fraud under the IFPA with particularity.  Finally, Defendants claim that Lincoln failed to properly plead that jurisdiction rests with this Court.

For the reasons set forth below, Defendants' motion is denied, and the parties are directed to proceed with discovery.

## I. BACKGROUND[1]

**A. The Secondary Life Insurance Market**

The following summary of the stranger-owner life insurance policy market is derived from *Lincoln Nat. Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 884-86 (D.N.J. 2009) (JAP).  It provides background information necessary to understand the present controversy.

At the heart of Plaintiff's case is the legality of stranger-owned life insurance policies or also known as "STOLI" plans.   In order to execute a STOLI plan, an individual, usually an elderly one, procures life insurance on his or her own life with the intention of subsequently assigning the policy to a third party following the lapse of the policy's contestability period.  *Id. at 884*.  The insureds are often convinced to engage in these STOLI transactions as a way of obtaining money to be used on medical care.  *Id.*  As one court has explained, "[o]ften pejoratively termed 'stranger-owned life insurance policies' these policies enable the insured to obtain ready cash by selling his policy to a stranger whose only interest in the insured is his early

---

[1] In addressing Defendants' motion to dismiss, the Court must accept as true the allegations contained in the Complaint. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003); *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1301 (3d Cir. 1996). Accordingly, the facts recited herein are taken from the Amended Complaint, and exhibits appended thereto, and do not represent this Court's factual findings.

demise." *Id. at* 885 (citing *Life Prod. Clearing LLC v. Angel*, 530 F.Supp.2d 646, 648 (S.D.N.Y.2008)).

A typical STOLI transaction begins with an agent who sells a life insurance policy to an elderly insurable candidate in exchange for up-front cash. *Id.* The agent explains that the candidate can obtain the policy at virtually no cost to the insured because the agent has secured non-recourse financing to purchase the policy. *Id.* The elderly insured, in turn, promises to sell the policy in the future to a lender if certain conditions are not met. *Id.* The insured then acts as a "nominal grantor" of a life insurance trust that is used to apply for the policy. *Id.* "At that time, the agent will tell the insured that, in all probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured." *Id.* (citing J. Alan Jensen & Stephan R. Leimberg, *Stranger-Owned Life Insurance: A Point/Counterpoint Discussion*, 33 ACTEC J. 111 (2007)).   If the insured is still alive following the expiration of the two-year contestability period found in the policy, the owner -- the life insurance trustee -- typically has three options: (1) sell the policy to investors; (2) have the insured pay off any outstanding debt and allow the insured to retain the policy; or (3) transfer the policy to a lender in order to avoid foreclosure. *Id.*   Because these individual lenders have no interest in the life of the insured other than their hope to profit from their deaths, and life insurance companies are finding themselves owing on more and more policies, courts across the country are evaluating the legitimacy of such STOLI plans.

**B. The Policies**

On or about May 3, 2006, the Applications for life insurance policies on the life of 85-year-old Ms. Schwarz were submitted to Lincoln.  Am. Compl. ¶¶ 20-21.  The Applications identified the Trust, created on March 16, 2005, and located at 124 East 4th Street, Lakewood,

New Jersey 08701, as the proposed owner and sole beneficiary of the proposed policies.  *Id*. ¶¶ 22-23.   According to the Amended Complaint, the Applications were signed in the State of New Jersey on May 3, 2006 by: (a) Ms. Schwarz, as the proposed insured; (b) Yoel Schwarz, as trustee of the Schwarz Insurance Trust, the proposed owner of the proposed policies; and (c) Abraham Weinstock, as the broker of the proposed policies (collectively, the "Applicants").  *Id*. ¶ 24.   However, Defendants dispute this allegation, and assert that the Applications were executed in Brooklyn, New York.  Mem. Supp. Def.'s Mot. Dismiss at 2.

According to the Applications, Ms. Schwarz had total assets and a net worth of $10.3 million and an annual earned income of $433,000.  Am. Compl. ¶ 25.   Question 59 of the Applications queried: "Do you have any applications pending with any other life insurance company now?"  Am. Compl. ¶ 26; Ex. A at 26; Ex. B. at 26 .  On both Policies, this question was answered "Yes."  *Id*. The Applications provided blank spaces in which the Applicants were asked to "please give details . . . for each Proposed Insured." Am. Compl. ¶ 26. The response on the Applications indicated only: "Applied to AIG but the JP product is a better one, the client says."  *Id*.  Additionally, in response to Questions 63 and 64 of the Applications, the Applicants represented to Lincoln that they had not been involved in any discussion about the possible sale or assignment of the Policies to a life settlement, viatical or other secondary market provider.  *Id*. ¶ 27.  The Applications also each contained an "Agreement and Acknowledgment" section, both of which the Applicants signed, which provides in pertinent part:

> Each of the Undersigned declares that: . . . (2) Unless otherwise provided by the Conditional Receipt, the Company will have no liability under this application unless and until: … (d) at the time of delivery and payment, the facts concerning the insurability of each person proposed for insurance are as stated in this application. . . . Each of the Undersigned declares that: . . . (6) I HAVE READ, or have had read to me, the completed Application for Life Insurance before signing below. All statements and answers in this application are correctly recorded, and

are full, complete and true. I UNDERSTAND that any false statements or material misrepresentations may result in the loss of coverage under the policy."

Am. Compl. ¶¶ 28-29; *Id*. Ex. A at p. 29; *Id*. Ex. B at p. 29.

On or about June 23, 2006, Lincoln issued life insurance policy JP5545877 to the Trust insuring the life of Ms. Schwarz in the amount of $2.5 million. *Id*. ¶ 31. On or about June 26, 2006, Lincoln issued the second life insurance policy, JP5549328, to the Trust insuring Ms. Schwarz for an additional $2 million. *Id*. ¶ 33. Upon issuance, the Policies were delivered to the Trust in Lakewood, New Jersey. *Id*. ¶ 32, 34. Subsequent to the issuance of the Policies, premium payments were forwarded to Lincoln on checks which indicated that the Trust located in Lakewood, New Jersey was the depositor and account owner. *Id*. ¶ 35. Likewise, at all times, Lincoln was directed to send, and did send, all policy account notices and statements to the Trust in Lakewood, New Jersey. *Id*. ¶ 36.

Each of the Policies contains the following provision ("Incontestability Clause(s)"):

**Incontestability** We will not contest this certificate after it has been in force during the insured's lifetime for 2 years from the Issue date. An increase in the Specified Amount will not be contested after it has been in force during the Insured's lifetime for 2 years from its effective date.

*See* Ex. A at 14; Ex. B at 14.

Ms. Schwarz died on February 12, 2009, at the age of 87. Am. Compl. ¶ 37. Approximately one month later, a claim for the death benefits under the Policies was submitted to Lincoln by the Trust. *Id*. ¶ 38. Following Ms. Schwarz's death and the submission of the claim for the death benefits under the Policies, Lincoln commenced a death claim investigation. *Id*. ¶ 39. Lincoln asserts that the submission of the Applications and the resulting Policies were part of a conspiracy and collaborative effort by the Applicants and/or those acting on their behalf, or in concert with them, and other entities engaged in STOLI transactions to profit at

5

Lincoln's expense from a gamble upon the life of Ms. Schwarz. *Id*. ¶ 40. Lincoln contends that, in furtherance of the fraudulent scheme, the Applicants and/or those acting on their behalf or in concert with them falsely, knowingly, and intentionally made fraudulent and material misrepresentations and/or omissions to Lincoln concerning Ms. Schwarz's finances, the existence of other life insurance and/or applications, and the true purpose behind the procurement of the Policies. *Id*. ¶¶ 41-42.

Consequently, on July 7, 2009, Lincoln filed a Complaint for Declaratory Judgment in this Court. Thereafter, Lincoln amended its Complaint on August 24, 2009: (1) seeking a declaratory judgment that the Policies lacked an insurable interest ("Count I"); (2) asserting that Defendants committed common law fraud ("Count II"); and (3) asserting that Defendants violated the IFPA ("Count III"). Among other relief requested, Lincoln sought a declaration that the Policies are void, void *ab initio*, or voidable due to a lack of insurable interest at the inception, and thus no death benefits are payable. In lieu of filing an Answer in the instant action, Defendants move to dismiss the Complaint.

## II. DISCUSSION

### A. Jurisdiction

Lincoln states that its own citizenship is in Indiana and alleges "upon information and belief" the defendant trustees Yoel Schwarz and Ernst Schwarz are New York residents, which Defendants do not dispute. Am. Compl. ¶¶ 5-7. Defendant argues that Lincoln failed to properly allege the Trust's citizenship because Lincoln's Amended Complaint does not identify the beneficiaries of the Trust. Mem. Supp. Def.'s Mot. Dismiss at 27. Lincoln, in turn, contends that Defendants have intentionally withheld the identity of the beneficiary of the Trust because "STOLI fraudsters . . . nam[e] a trust as the beneficiary of the policy, and then subsequently

[sell] the beneficiary interest in the trust" to avoid leaving a paper trail that would allow the insurer "to identify SOTLI schemes and policies lacking a valid insurable interest."   Opp'n. Mem. at 35-36.  Lincoln characterizes this jurisdictional argument as frivolous and disingenuous. *Id*. at 34.

The reason Lincoln did not plead identity of the beneficiary is because it cannot; the Trust was not clearly identified in the Applications.  The Court is satisfied at this juncture that it has diversity jurisdiction because the Trust is located in New Jersey, the trustees are both New York residents, and Lincoln is a citizen of Indiana.  There is no mention, or any dispute, that any of the parties, the Trust or otherwise, are located in Indiana.  Therefore, the Court finds that Plaintiff has sufficiently pled federal diversity jurisdiction.  Nevertheless, if through discovery, the identities of the beneficiary and owner / holder of the beneficial interest in the trust are revealed, Lincoln should amend its Amended Complaint to include those identities.

## B. Standard of Review Under Rule 12(b)(6)

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted).  In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the 12(b)(6) standard.  Specifically, the Court "retired" the language contained in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id. at 561* (quoting *Conley*, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to

relief above the speculative level." *Id. at 555*.  As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest 'the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element'." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

In affirming that *Twombly* standards apply to all motions to dismiss, the Supreme Court recently explained the principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id. at 1950*.  Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211.

## C.  Count I (Lack of Insurable Interest) [2]

---

[2] The Court notes that the parties have raised a choice-of-law issue.  Defendants contend that that this Court does not need to make a choice of law determination because the laws of New Jersey and New York controlling incontestability clauses do not differ.  Mem. Supp. Def.'s Mot. Dismiss at 11-12.  Defendants further argue that if this Court determines that a choice of law analysis is necessary, New York law should control because New York was the state of Ms. Schwarz's residence and "the New Jersey contact with this case is *de minimis*."  *Id. at 11*. Plaintiff, on the other hand, contends that because the Policies were contracted for, executed, issued, and delivered in New Jersey, and the beneficiary was a Trust located in New Jersey, the reasonable expectations of the contracting parties is that New Jersey law applies.  Opp'n. Mem.

In Count I of the Amended Complaint, Lincoln seeks a declaratory judgment that there was no insurable interest at the inception of the Policies because they "were procured at the behest of, and/or under the direction of, a party or parties with no insurable interest in the life of the insured…" Am. Compl. ¶ 56. Lincoln points to alleged misrepresentations made during the application process, and contends that after a reasonable opportunity for discovery it will be demonstrated that: "the Policies were issued to, at the behest of, and/or in accordance with a plan initiated to transfer the Policies, directly or indirectly, in the secondary market[;] . . . Ms. Schwarz was financially incapable of funding the Polices and, in fact, did not fund the Policies, directly or indirectly[;] . . . the Policies were to benefit strangers in the event of Ms. Schwarz's death[;] . . . [and] the purpose of [the] transaction was to gamble upon the life of Ms. Schwarz." *Id.* ¶¶ 57-61.

### 1. Insurable Interest

With respect to Plaintiff's contention that the Policies lacked a person with an insurable interest at their inception, Defendants argue that regardless of the merits of Plaintiff's claim,

---

at 12. However, the Court finds that to make such a finding would be premature and unnecessary since, for purposes of the instant motion, the laws of New Jersey and New York are materially the same and further factual development is necessary for the choice-of-law determination. *See Calhoun*, 596 F. Supp. 2d at 887, n.6 (D.N.J. 2009) (declining to make choice-of-law determination when New York and New Jersey law on material misrepresentations and insurable interests in life insurance contracts were materially the same and further factual development was necessary); *American General Life Ins. Co. v. Ellman Savings Irrevocable Trust*, No. 08-cv-03489, Transcript at 55 (D.N.J. Dec. 17, 2009) (declining to make choice-of-law determination on motion to dismiss in case involving New York and New Jersey law on incontestability clauses and insurable interests in life insurance contracts); *Slater v. Skyhawk Transp., Inc.*, 77 F. Supp. 2d 580, 586 (D.N.J.1999) (noting that first step in choice-of-law analysis requires determining whether there is a conflict between the potentially applicable laws); *Taylor v. JVC Ams. Corp.*, No. 07-4059, 2008 WL 2242451, *4 (D.N.J. May 30, 2008) (in deciding a motion to dismiss, observing that, "assuming that the statutes differ, the second step of the Court's choice-of-law analysis is fact-dependant and, at least in this case, not amenable to decision on a motion to dismiss"). Accordingly, the laws of both New Jersey and New York will be referenced in analyzing Lincoln's claims.

Lincoln's action must be dismissed because life insurance policies that are purchased with the intention to be sold still have an insurable interest under the laws of New Jersey and New York. Mem. Supp. Def.'s Mot. Dismiss at 26.   Defendants cite to N.J.S.A. § 17B:24-1.1(b) and N.Y.Ins.Law § 3205(b)(1).  N.J.S.A. § 17B:24-1.1(b) provides:

> No person shall procure or cause to be procured any insurance contract upon the life, health or bodily safety of another individual unless the benefits under that contract are payable to the individual insured or his personal representative, or to a person having, *at the time when that contract was made*, an insurable interest in the individual insured.

(emphasis added).  N.Y. Ins.Law § 3205(b)(1) states as follows:

> Any person of lawful age may on his own initiative procure or effect a contract of insurance upon his own person for the benefit of any person, firm, association or corporation. Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract so procured or effectuated.

However, § 3205(b)(1) must be read in conjunction with § 3205(b)(2), which provides:

> No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person insured or his personal representatives, or to a person having, *at the time when such contract is made*, an insurable interest in the person insured.

(emphasis added).  Defendants contend that "[e]ven if the Trust [had] immediately transferred the [P]olic[ies] to someone else, which Lincoln does not allege, the Policies would still be viable under the insurable interest statute[s]."  Mem. Supp. Def.'s Mot. Dismiss at 26.  In the same regard, Defendants allege that the Policies were taken out to benefit the Trust, and Lincoln's claim should be dismissed because it failed to "alleg[e] that, at the time the contract was made, the Trust benefited a stranger." *Id*. at 27.  The Court disagrees.

Both New Jersey and New York law require an insurable interest to exist at the time a life insurance policy is issued. *See* N.J.S.A. § 17B:24-1.1(b); N.Y.Ins.Law § 3205(b)(2).  Statutory definitions of "insurable interest" recognize that an individual has an insurable interest in her

own life or the life of a close blood relation, and also where there exists an economic interest in the continued life of the insured. *See* N.J.S.A. § 17B:24-1.1(a)(2) (requiring "an expectation of pecuniary advantage"); N.Y.Ins.Law § 3205(a)(1)(A)-(B) (requiring "a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured"). Additionally, an individual who obtains life insurance on her own life is permitted to transfer ownership of the procured policy to a person or entity that lacks an insurable interest. *See Calhoun*, 596 F. Supp. 2d at 889 (citing *Travelers' Ins. Co. v. Morris*, 115 N.J. Eq. 142, 144-45 (1934)) (recognizing legality of assigning insurance policies to parties without an insurable interest as long as the contract was not "a wager in its inception"); N.Y.Ins.Law § 3205(b)(1) (permitting "the immediate transfer or assignment of a contract of insurance upon his own person for the benefit of any person, firm, association or corporation" if insured procured or effected the policy "on his own initiative"). Under the laws of both states,"[i]nsureds begin to run afoul of the insurable interest requirement, however, when they intend at the time of the policy's issuance, to profit by transferring the policy to a stranger with no insurable interest at the expiration of the contestability period. *Calhoun*, 596 F. Supp. 2d at 889; *see also* N.Y.Ins.Law § 3205(b)(2) ("No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person insured or his personal representatives, or to a person having, at the time when such contract is made, an insurable interest in the person insured").

The Supreme Court first recognized the insurable interest requirement nearly a century ago in *Grigsby v. Russell*, 222 U.S. 149 (1911). The Court explained that, "[a] contract of insurance upon a life in which the [policy owner] has no interest is a pure wager that gives the [policy owner] a sinister counter interest in having the life come to an end." *Id. at 154-55*. This

requirement operates to prevent the prohibited "wagering" contracts. *Calhoun*, 596 F. Supp. 2d at 889.  As a court in this district has noted, "[t]he insurable interest requirement developed to curtail use of insurance contracts as wagering contracts by distinguishing between contracts that sought to dampen the risk of actual future loss and those that instead sought to speculate on whether some future contingency would occur. Without an insurable interest, there would be no actual loss; the contract would thus be a pure gamble." *Id.* (quoting *Sun Life Assurance Co. of Canada v. Paulson*, No. 07-3877, 2008 WL 451054, *2 n. 4 (D. Minn. Feb. 15, 2008)) (internal quotations and citations omitted).

In this respect, Lincoln equates STOLI arrangements with "wagering contracts," which are precluded by public policy.  Over a century ago, the Supreme Court, in *Warnock v. Davis*, 104 U.S. 775, 779 (1881), noted that absent "a reasonable ground . . . to expect some benefit or advantage from the continuance of the life of the assured[,]" such policies are, "independently of any statute on the subject, condemned, as being against public policy."  This is the law in New York. *See New England Mut. Life Ins. Co. v. Caruso*, 73 N.Y.2d 74, 77-78 (N.Y. 1989) (noting that "[w]hen one insures [her] own life, the wagering aspect is overridden by the recognized social utility of the contract as an investment to benefit others . . . [but] [w]hen a third party insures another's life . . . the contract does not have the same manifest utility and assumes more speculative characteristics which may subject it to the same general condemnation as wagers") (citations omitted).

While New Jersey state courts have not addressed this specific issue, a court in this district recently construed New Jersey law regarding insurable interests in a case with similar facts in *Calhoun*, 596 F. Supp. 2d at 882.  In *Calhoun*, the plaintiff insurance company sought a finding that a life insurance policy held by the defendants was void *ab initio* because, "at the

time [defendant insured] applied for a life insurance policy, [defendant insured] intended to sell his policy to 'stranger investors' in the secondary life insurance market[.]" *Id. at 884-86*.  In response, the defendants filed a motion to dismiss, asserting that it was "legally permissible for an individual applying for life insurance to have a pre-existing agreement with a stranger lacking an insurable interest in the life of the person applying for insurance." *Id. at 887*.  After noting that neither the Third Circuit nor the New Jersey Supreme Court had addressed the issue before the court, the court denied defendant's motion to dismiss, explaining:

> This [c]ourt finds that because issues of intent are crucial to this determination, dismissal at this juncture would be premature. . . . Here, [the plaintiff] is entitled to proceed and attempt to discover whether, and with whom, Calhoun had arranged to sell the [p]olicy at the time the [a]pplication was submitted to [the plaintiff]."

*Id. at 890*.

This Court finds further support for Plaintiff's position that these types of "wager" arrangements should not be enforced in New Jersey because of the state courts' strong distaste for contracts that are contrary to public policy.  *See Vasquez v. Glassboro Service Ass'n Inc.*, 83 N.J. 86, 99 (1980) (noting that "no contract can be sustained if it is inconsistent with the public interest or detrimental to the common good"); *Hebela v. Healthcare Ins. Co.*, 370 N.J. Super 260, 270 (App. Div. 2004) (explaining that "our courts will decline to enforce an insurance policy, like any other contract, if its enforcement would be contrary to public policy"); *Saxon Construction & Management Corp. v. Masterclean of N.C., Inc.*, 273 N.J. Super. 231, 237 (App. Div. 1994) (maintaining that "it is equally well recognized that our courts may refuse to enforce contracts that are unconscionable or violate public policy").

Further, a survey of precedent from other state and federal courts demonstrates that the majority view is that life insurance contracts that lack a person with an insurable interest at

13

inception are akin to wagering contracts, and therefore void *ab initio*.  *See Atkinson v. Wal-Mart Stores, Inc.*, No. 8:08-cv-691-T-30, 2009 WL 1458020, *3 (M.D. Fla. May 26, 2009) ("Florida courts have long held that insurable interest is necessary to the validity of [a life] insurance contract and, if it is lacking, the policy is considered a wagering contract and void *ab initio* as against public policy"); *Sun Life Assur. Co. of Canada v. Paulson*, No. 07-3877, 2008 WL 451054, *1 (D. Minn. Feb. 15, 2008) ("Under Minnesota law, an insurance policy is void *ab initio* if, at the time of the policy's issuance, the insured has no insurable interest"); *Hilliard v. Jacobs*, 874 N.E.2d 1060, 1063 (Ind. Ct. App. 2007) (where "a policy is issued to one upon the life of another, the former having no insurable interest in the latter, it is void, being in the nature of a wagering contract, and hence in contravention of public policy"); *Farmers Butter and Dairy Co-op v. Farm Bureau Mut. Ins. Co.*, 196 N.W.2d 533, 536 (Iowa 1972) ("In the absence of [an insurable] interest, legal, equitable or real, in the thing or right insured the policy of coverage is nothing more than a mere wager, therefore void [*a*]*b initio*").

Having surveyed precedent from various jurisdictions, this Court agrees with Lincoln that the New Jersey Supreme Court would likely follow decisions from other state and federal courts that have held that a lack of insurable interest by an insured at the inception of a life insurance policy causes the policy to be void *ab initio*.  In that regard, the New Jersey Supreme Court would likely hold that the STOLI arrangement, as alleged by Lincoln, would be akin to a wagering contract, and therefore, void *ab initio*. Contrary to Defendants' arguments, Lincoln has adequately pled that the Policies lacked a person with an insurable interest at their inceptions. Lincoln has not only pled that the life insurance policies were procured by individuals with no insurable interest in Ms. Schwarz's life, but Lincoln also pled that the Policies were "sought by, and intended for, persons who were complete strangers to Ms. Schwarz and had no legally

cognizable interest in Ms. Schwarz's life." Am. Compl. ¶¶ 2, 51.  Like in *Calhoun*, in which the court held that it would be premature to dismiss a claim that a life insurance policy was void *ab initio* because discovery was essential to determining if the defendant had arranged to sell the policy to an individual or individuals with no insurable interest in the defendant's life at the time the policy application was submitted, here, it would be premature to dismiss Plaintiff's claim for the same reason.

Accordingly, Plaintiff has pled sufficiently that the Policies lacked a person with an insurable interest at their inception.

### 2. Incontestability Clause

Defendants next argue that Count I should be dismissed because, under the laws of both New Jersey and New York, the Incontestability Clauses found in the Policies absolutely bars this action and any action commenced after the expiration of the two-year contestability period. New Jersey and New York law provide that all life insurance policies must contain a clause that makes the policy incontestable by the life insurer after being in force for two years.  N.J.S.A. § 17B:25-4; N.Y.Ins.Law § 3203(a)(3).  Court decisions in the past construing New Jersey and New York law supports Defendants' interpretation of the effect of incontestability clauses.  *See Strawbridge v. New York Life Ins. Co.*, 504 F. Supp. 824, 826-28 (D.N.J. 1980) (rejecting argument that incontestability provision never took effect because life insurance policy was not procured by the insured); *Prudential Insurance Co. of America v. Connallon*, 108 N.J. Eq. 316, 318-19 (1931) (rejecting argument that incontestability clause was intended to be conditional upon the policy taking effect); *Formosa v. Equitable Life Assur. Soc. Of U.S.*, 166 N.J. Super. 8, 12 (App.Div. 1979) (noting that "an action for rescission based on equitable fraud must be commenced prior to the incontestability clause in the policy taking effect"); *Russ v. Metropolitan*

*Life Ins. Co.*, 112 N.J.Super. 265, 274  (App.Div. 1970) (noting that "no defense based upon fraud may be asserted to defeat a claim on the policy after the contestable period has expired"); *Caruso*, 73 N.Y.2d at 81-84  (holding that insurer was barred, due to expiration of statutory incontestability period prior to insured's death, from asserting that beneficiary had no insurable interest in the life of the insured); *Columbian Natl. Life Ins. Co. v. Hirsch*, 267 N.Y. 605 (1935) (affirming judgment of lower court that incontestability clause barred the plaintiff from seeking rescission of the policies).

However, in response to instances of insurance fraud, there has recently been a significant shift in case law in both New York and New Jersey creating certain exceptions to the incontestability of life insurance policies after the expiration of the two-year period of contestability.  For example, in *United States Life Ins. Co. in the City of New York v. Grunhut*, 2007 N.Y. Misc. LEXIS 9114, *13 (N.Y. Sup. Ct. Aug. 24, 2007), the court held that, "for the insurer to be entitled to rescind [a] policy *ab initio*, after it ha[s] been in existence for two years during the insured's lifetime, it must identify a material misrepresentation in the application that was intended to defraud the insurer" (citations omitted). There, the plaintiff "alleged that the information contained in [a] [life insurance] [a]pplication was false and incomplete, that the defendants knew that to be the case, and that the defendants made representations with the knowledge that plaintiff would rely upon such information."  *Id.*   The court found those allegations sufficient to overcome the defendants' motion to dismiss.  *Id.*  More specifically, in the context of an alleged STOLI scheme, the court in *Kramer v. Lockwood Pension Servs. Inc., et al*, 653 F. Supp. 2d 354, 398 (S.D.N.Y. 2009), instead of finding that the expiration of a life insurance policy's incontestability clause barred an action for rescission, recognized that "there is indeed substantial ground for difference of opinion on the application of New York Insurance

16

Law to [STOLI] arrangements of this type[,]" and thus certified an Order for an interlocutory appeal to the Second Circuit so that court could decide the issue.[3]

On the same point, New Jersey has enacted the IFPA in order "to confront aggressively the problem of insurance fraud . . . [by] requiring the restitution of fraudulently obtained insurance benefits." N.J.S.A. 17:33A-2. The New Jersey Supreme Court has recognized that "[i]nsurance fraud is a problem of massive proportions that currently results in substantial and unnecessary costs to the general public in the form of increased rates." *Merin v. Maglaki*, 599 A.2d 1256, 1259 (N.J. 1992). Most significantly, in *Ellman Savings Irrevocable Trust*, No. 08-cv-03489, Transcript of Motion Hearing, (No. 55) at 55, a court in this district dealing with an alleged STOLI scheme stated:

> We do not need to indulge at this point in an elaborate prediction of what New Jersey law will do with a claim of legal fraud in the face of an incontestability clause because the 1995 New Jersey Supreme Court in the *Ledley* [*v. William Penn Ins. Co.*] case, albeit *in dicta*, but dicta from the highest court in the state, with a unassailable voice of authority stated unequivocally, "Even after the expiration of the contestability period an insurer may deny a claim if the insured committed fraud in the policy application," 138 N.J. 627 at 635, in the context of a case involving a life insurance policy, dicta only because that policy had not become incontestable until suit.

In response to the *Ledley* language that the *Ellman Savings* court found persuasive, Defendants argue that that the statement was *in dicta* and thus holds no precedential or

---

[3] Defendants cite two New York cases, *Security Mut. Life Ins. Co of New York v. Herpaul*, 827 N.Y.S.2d 141 (1st Dept. 2007) and *Reliastar Life ins. Co. of New York v. Leopold*, 745 N.Y.S.2d 810 (N.Y.Sup. 2002), for the proposition that fraud does not invalidate any incontestability clause. In each case, a plaintiff life insurance company alleged that the defendants had fraudulently obtained life insurance benefits, and the respective courts found that the claims were time barred due to the expiration of the contestability period. However, neither case dealt with a STOLI scheme. In light of the *Kramer* court's recognition that in New York there exists uncertainty regarding the applicability of incontestability clauses in the context of STOLI claims, 653 F. Supp. 2d at 398, these cases are not sufficient to warrant granting Defendants' motion to dismiss. Rather, at this stage the Court finds that Plaintiff has pled sufficiently to withstand 12(b)(6) scrutiny. *See infra*.

persuasive value.  Defendants contend that a simple reading of the case *Ledley* cited to when making the above statement, *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190, 199 (1994),  shows that the *Ledley* court did not intend for their statement to apply in the case at bar.  In *Haas* the court was construing New Jersey's disability / health insurance statute, which provides:

> After 2 years from the date of issue of this policy no misstatements, *except fraudulent misstatements*, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such 2-year period.

N.J.S.A. § 17B:26-5 (emphasis added).  The plaintiff insurer sought to deny a disability claim, after the policy's incontestability period had lapsed, because the defendant had failed to disclose a pre-existing condition in his insurance application.  The court found that § 17B:26-5  gave the plaintiff the option of inserting a provision in the policy that would have excluded fraudulent misstatements from the protection of the incontestability clause, and their failure to do so meant that they were not permitted to rescind the policy, even for fraud, after that period lapsed.  *Haas*, 137 N.J. at 199-202.  Thus, Defendants argue, the statement by the New Jersey Supreme Court in *Ledley*, *in dicta*, should not be applied to the case at bar because, unlike the statute in question in *Haas*, New Jersey's life insurance incontestability statute does not explicitly allow insurance companies to exclude fraudulent misstatements from the litigation bar imposed by the incontestability clause.

For the purposes of the instant matter, Plaintiff has adequately pled that the Incontestability Clause does not bar its claim.  Defendants' attempt to dispose of the significance of *Ledley* is unavailing.  While Defendants' argument that the *Ledley* court misread *Haas* has some merit, construing the allegations contained in the Amended Complaint most favorably to Lincoln, it would be premature to dismiss this claim.  As explained in *Ellman Savings*, the New Jersey Supreme Court's statement in *Ledley* -- that an insurer is permitted to rescind an insurance

18

policy after the two-year contestability period if the insured committed fraud in the policy application -- persuades this Court that Lincoln has adequately made out a claim that the expiration of the Policies' Incontestability Clauses do not bar Lincoln's claim at this time. Indeed, discovery and further briefing are needed in order for this Court to make a legal determination on this issue. Furthermore, Lincoln has also pled adequately under New York law. Like in *Grunhut*, where the court found that the plaintiff had identified material misrepresentations that would defeat the expiration of an incontestability clause to the extent necessary to survive a motion to dismiss, here, Plaintiff alleges that the defendant trustees submitted Applications that contained false and incomplete information, that the defendants had knowledge that the information was not accurate, and that Defendants made misrepresentations with the knowledge that Plaintiff would rely on the incorrect information. *See* Am. Compl. ¶¶ 25-27, 30, 45-49.

Accordingly, Defendants' motion to dismiss Count I is denied.

**D. Count II (Fraud)**

In Count II of the Amended Complaint, Plaintiff alleges that Defendants committed common law fraud.  Plaintiff contends that after a reasonable opportunity for discovery it will demonstrate that "Defendants procured the Policies for the purpose of selling them in the secondary market . . . [and] made misrepresentations and/or omissions with the intention that Lincoln would rely on them in issuing the Policies."  Am. Compl. ¶ 64.  Defendants argue that Lincoln's common law fraud claim should be dismissed because by "alleg[ing] in conclusory fashion that [D]efendants committed fraud and claims that the insured, a non-party, misrepresented her net worth but fails to identify a single fraudulent statement by the Trust," Lincoln failed to plead fraud with particularity as required by Federal Rule of Civil Procedure

9(b).  Mem. Supp. Def.'s Mot. Dismiss at 19-20.  Defendants claim that the allegations made by Lincoln mirror those found insufficient to state a claim of common law fraud in *Kramer*, 653 F. Supp. 2d 354.  *Id.* at 21-23.

The general elements of a fraud claim are the same in New Jersey and New York.  *See Shapiro v. Barnea*, No. 06-811, 2006 WL 3780647, *3 (D.N.J. Dec. 21, 2006) ("The Court notes that the general elements of fraud claims are the same in New York and New Jersey"); *see also Gallerstein v. Berkshire Life Ins. Co. of America*, No. 05-05661, 2006 WL 2594862, *5 (D.N.J. Sept. 11, 2006). To sustain a fraud claim under New Jersey law, a plaintiff must establish: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Dewey v. Volkswagen AG*, 558 F. Supp.2d 505, 525 (D.N.J. 2008).  Similarly, under New York law, the elements of a cause of action for fraud require "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009) (citations omitted).

Rule 9(b) provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud…"[4] In meeting the particularity requirements of Rule 9(b), a plaintiff must plead "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  While a plaintiff must allege "who made a misrepresentation to whom and the general content of the misrepresentation," *Lum v.*

---

[4] Neither party disputes that Rule 9(b) applies to Plaintiff's claim for common law fraud.

*Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004), a plaintiff "need not . . . plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  *Campmor, Inc. v. Brulant, LLC*, No. 09-5465, 2010 WL 1381000, *7 (D.N.J. April 1, 2010) (quoting *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998).  Because certain aspects of an alleged fraud may have been concealed by a defendant, courts apply Rule 9(b) "with some flexibility." *Ramirez v. STi Prepaid LLC*, 644 F. Supp.2d 496, 502 (D.N.J. 2009) (quoting *Rolo*, 155 F.3d at 658). As the Third Circuit has explained:

> While we have acknowledged the stringency of Rule 9(b)'s pleading requirements, we have also stated that, in applying Rule 9(b), courts should be "sensitive" to situations in which "sophisticated defrauders" may "successfully conceal the details of their fraud." Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed. Nevertheless, even when the defendant retains control over the flow of information, "*boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible*."

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d. Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997)) (internal citations omitted).

Recently district courts in both New Jersey and New York have analyzed the requirements of 9(b) as they relate to misrepresentations and/or omissions made in the application process for life insurance.   In *American General Life Ins. Co. v. Altman Family Ins. Trust ex rel. Altman*, No. 08-399, 2009 WL 5214027, *1-2 (D.N.J. Dec. 22, 2009), the plaintiff, already seeking a declaratory judgment that certain life insurance policies were void *ab initio* due to misrepresentations in the application process, sought leave to amend its original complaint to add a fraud claim against the original defendants, the trust by and through two of its trustees, as

well as five individual defendants.   The defendant trust argued against the amendment, contending that the proposed amended complaint was not pled with specificity because it did not "distinguish the allegedly fraudulent conduct in which each defendant engaged." *Id*. at *4.   The court disagreed:

> As to the fraud, Plaintiff has plead that the [certain proposed defendants] "purposefully misrepresented a proposed defendant's income, net worth and the amount of other life insurance coverage in-force or being sought on [proposed insured's] life to multiple life insurance companies...." Plaintiff has also plead that [proposed insured] did not qualify for the life insurance coverage sought, that [p]laintiff did not know this fact and the policy was obtained with the intent to profit from the sale of the policies or upon [proposed insured]'s death. Finally, [p]laintiff plead that [certain proposed [defendants] were responsible for providing the alleged misrepresentation to [p]laintiff and that [other proposed defendants] actually submitted those applications. As such, [p]laintiff has alleged enough facts to place the [proposed defendants] on notice of the claims against them and have sufficiently alleged which [d]efendant made the material misrepresentations.

*Id*. at *5.

On the other hand, in *Kramer*, 653 F. Supp. 2d. at 378-80, the court granted the defendants' motion to dismiss a counterclaim of common law fraud brought by a plaintiff insurance company that alleged that the defendants were involved in an "illegal [STOLI] scheme," and "[a]s a result of [insured's] misrepresentation, [insured] knowingly induced [plaintiff insurance company] to issue life insurance policies that it would not have issued but for [insured's] misrepresentations."   The court found that the plaintiff had not alleged a false representation, writing:

> The closest [plaintiff] comes to pleading fraud at any point . . . is their allegation that "[g]iven the applicable law and public policy prohibiting 'wager' life insurance policies, [defendants] implicitly represented that (a) the [trust] would be the true owner and beneficiary of the requested [policies] . . . and (b) the [trust] and its intended beneficiary had an insurable interest in [insured defendant's] life."   These "implicit" representations are just that, implicit, and do not appear on the face of the application for life insurance. [Insured defendant] never represented, nor omitted to disclose who the eventual beneficiary of his insurance

> trust would be, as that question was never asked of him in the application. . . .
> They cannot now claim that failure to disclose the identity of the beneficiaries of
> the Trust is fraud.

*Id. at 379*.  Additionally, the court found that the plaintiff did not sufficiently plead damages.  *Id.*

Discussing past cases involving insurance companies claiming damages, the court noted that

plaintiff's "only injury, to the extent it was injured at all, resulted from [defendant insured's]

alleged noncompliance with New York Insurance Law," and since that failure "was not casually

related to the damages [plaintiff] alleges . . . [plaintiff] has failed to plead sufficiently its

counterclaim of fraud."  *Id. at 379-380* (citations omitted).

Approximately ten months following the *Kramer* court's holding that a life insurance

company did not adequately plead material misrepresentations or damages when it merely

alleged that it would not have issued a life insurance policy if they knew a particular trust setup

by the defendant was not the policy's intended beneficiary, a court within the same district again

addressed a different common law fraud claim stemming from an alleged STOLI scheme in *Penn*

*Mut. Life Ins. Co. v. Wolk*, No. 09 Civ. 1808, 2010 WL 2594876 (S.D.N.Y. June 28, 2010).

There, the plaintiff alleged that during the application process, the insured "falsely answered in

the negative two [a]pplication questions directly inquiring whether [the insured] had ever

engaged in discussions to sell the [p]olicy in the secondary market, misrepresented the source of

the funds, and misrepresented his purpose in obtaining the policy."  *Id.* at *5.  Additionally, the

plaintiff pled damages by alleging that it had "incurred substantial damages . . . including . . .

costs and expenses associated with the issuance of the [policy]."  *Id.* at *6. The court found that

the plaintiff had adequately pled fraud, and denied defendant's motion to dismiss plaintiff's

common law fraud claim.  *Id.*

In light of the case law, Lincoln has sufficiently pled common law fraud.  Defendants'
attempt to analogize the allegations made by Lincoln in their Amended Complaint with those
made unsuccessfully by the defendants in *Kramer* is unconvincing.  Defendants contend that the
allegations made by Lincoln "do not amount to fraud since Lincoln never inquired as to whether
the [Policies were] STOLI polic[ies] or not."  Mem. Supp. Def.'s Mot. Dismiss at 25.  However,
unlike in *Kramer*, where the plaintiff merely alleged that defendants were involved in a STOLI
scheme, here, Defendants are alleged to have committed several material misrepresentations.
Lincoln alleges that the "Applicants fraudulently signed the 'Agreement and Acknowledgment'
section [of the Policies] verifying that they provided truthful, accurate and honest information on
the Application regarding the insurability of Ms. Schwarz."  *See* Am. Compl. ¶ 29.  Lincoln also
identifies numerous allegedly false statements attested to by Defendants in the Applications,
including, like in *Altman*, projections of Ms. Schwarz's net worth and annual earned income,
and, like in *Wolk*¸ answers to questions inquiring if Ms. Schwarz had discussed selling the
Policies in the secondary market.   *See Id*.  ¶¶ 25, 27, 45-46.  Thus, Lincoln has adequately pled
the first element of common law fraud -- material misrepresentations.

Second, by alleging that Defendants established the Trust in connection with a STOLI
scheme and that Defendants knew that the aforementioned misrepresentations were material,
Lincoln has sufficiently pled that Defendants had knowledge of the falsity of the alleged
misrepresentations. *See Id*. ¶¶ 19, 54.  Third, by alleging that the Applicants knew that they were
required to provide truthful information in the Applications, it is plausibly inferred that the
Applicants knew that Lincoln would rely on the Applications to determine if Ms. Schwarz
qualified for the Policies; Lincoln has sufficiently pled that Defendants intended for Lincoln to
rely on the alleged misrepresentations.  *See Id*. ¶ 30.  Fourth, by asserting that it would not have

issued the Policies if it knew of Ms. Schwarz's true financial condition, Lincoln has sufficiently pled its reasonable reliance on the alleged misrepresentations made by Defendants.  *See Id*. ¶ 4.

Defendants also rely on *Kramer* to assert that Lincoln has not sufficiently pled the fifth and final element of common law fraud -- damages. Defendants' reliance on *Kramer* is again misplaced.  Whereas the plaintiff in *Kramer* only alleged that it would suffer damages if it had to pay out on life insurance policies procured by the defendants, here, Lincoln has pled damages consisting of not just the future damages it will incur if it has to pay the Trust the money owed under the Policies, but also, "substantial damages as a result of Defendants' wrongful conduct, including, among other things, costs and expenses associated with the issuance of the Policies." *See Id*. ¶¶ 66-67.  Indeed, similarly, the *Wolk* court found that the plaintiff had adequately pled damages by asserting that it had "incurred substantial damages . . . including . . . costs and expenses associated with the issuance of the [policy]." Thus, Lincoln has adequately pled damages.

 For the purposes of surviving a motion to dismiss, Lincoln has adequately pled each element of fraud under New Jersey and New York law.  Accordingly, Defendants' motion to dismiss Count II is denied.

## E. Count III (IFPA)

The IFPA was enacted by the New Jersey Legislature

> to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims.

N.J.S.A. 17:33A-2.  In *Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 172-73 (2006), the New Jersey Supreme Court provided an summary of some of the key provisions of the IFPA as they relate to the rights of defrauded insurance companies.

25

... IFPA interdicts a broad range of fraudulent conduct. For example, a "person or practitioner" violates the Act if he or she

[p]resents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim.

[ N.J.S.A. 17:33A-4(a)(1).]

Other violations of the Act include but are not limited to concealing or knowingly failing to disclose information concerning a person's initial or continued right or entitlement to a benefit, N.J.S.A. 17:33A-4(a)(3); presenting any knowingly false or misleading statement in an insurance application, N.J.S.A. 17:33A-4(a)(4)(b); or knowingly assisting, conspiring with, or urging any person or practitioner to violate any of the Act's provisions, N.J.S.A. 17:33A-4(a)(5)(b).

. . .

The Act further allows any insurance company that has been damaged as a result of a statutory violation to bring a civil action to recover compensatory damages, including reasonable investigation costs and attorneys' fees. N.J.S.A. 17:33A-7a. A successful insurance company shall recover treble damages if the court determines that the defendant engaged in a pattern of violations under the Act. N.J.S.A. 17:33A-7b. In addition, the Act permits the Commissioner to join in such an action to recover civil penalties. N.J.S.A. 17:33A-7d. "If the commissioner prevails, the court may also award court costs and reasonable attorney[s'] fees actually incurred by the commissioner." N.J.S.A. 17:33A-7d. Finally, any person who is found to have committed insurance fraud must pay a $1,000 surcharge. N.J.S.A. 17:33A-5.1. And, in the context of automobile insurance fraud-a context not present here, see note 4, infra, 186 N.J. at 180, 892 A.2d at 1250, -a violator of IFPA is subject to a mandatory one-year loss of driving privileges. N.J.S.A. 39:6A-15.

IFPA allows any insurance company that has been damaged as a result of a statutory violation to bring a civil action to recover compensatory damages, including reasonable investigation costs and attorneys' fees. N.J.S.A. 17:33A-7a. A successful insurance company shall recover treble damages if the court determines that the defendant engaged in a pattern of violations under IFPA. N.J.S.A. 17:33A-7b. In addition, IFPA permits the Commissioner to join in such an action to recover civil penalties. N.J.S.A. 17:33A-7d. "If the commissioner prevails, the court may also award court costs and reasonable attorney[s'] fees actually incurred by the commissioner." N.J.S.A. 17:33A-7d. Finally, any person who is found to have committed insurance fraud must pay a $1,000 surcharge. N.J.S.A. 17:33A-5.1.

Because Lincoln's common law fraud claim survives the present motion to dismiss, Lincoln's claim under the IFPA also survives because this type of claim requires much less thorough pleading.  Unlike common law fraud, proof of fraud under the IFPA does not require proof of reliance on the false statement or resultant damages, *see Land*, 186 N.J. at 174–75, nor proof of intent to deceive. *See State v. Nasir*, 355 N.J. Super. 96, 106, *cert. denied*, 175 N.J. 549 (2003).  The New Jersey Supreme Court has also held that "we must construe the [IFPA]'s provisions liberally to accomplish the Legislature's broad remedial goals."  *Land*, 186 N.J. at 173 (citation omitted).   Thus, for much the same reasons as discussed in Count II, Defendants' motion to deny Count III is denied.

**III. CONCLUSION**

Based on the foregoing, Defendants' motion to dismiss Lincoln's Amended Complaint is denied.

An order will be entered consistent with this Opinion.

Dated: August 18, 2010

_____s / Freda L. Wolfson_____
FREDA L. WOLFSON, U.S.D.J